**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil No. 5:20-cv-02274-JMG |
| | : | |
| AMBASSADOR ADVISORS, LLC, *et al.,* | : | |
| Defendants. | : | |

---

**MEMORANDUM OPINION**

**GALLAGHER, J.**                                                          **December 20, 2021**

## I.    OVERVIEW

Defendants Bostwick, Kauffman and Young own and operate Defendant Ambassador Advisors, an investment advisory firm. During the period at issue in this suit, their practice focused on investing their clients' money in mutual funds. For their services, Defendants charged their clients an advisory fee. They also indirectly collected certain referral fees, called "12b-1" fees, from the mutual funds in which they invested their clients' money.

Plaintiff brought this suit claiming that Defendants breached their fiduciary duties under the Investment Advisers Act of 1940 by maintaining their 12b-1 fee arrangement. Plaintiff also claims that Defendants failed to adopt certain written policies required under SEC Rule 206(4)-7. Defendants deny these claims and argue that they were simply investing their clients' money just as they told their clients they would. Defendants also argue that they cannot be held liable under the Advisers Act because they conformed their conduct to the SEC's official requirements.

Both parties have moved for summary judgment. For the reasons that follow, the Court denies Defendant's motion and grants Plaintiff's motion only in part.

II.    **FACTUAL BACKGROUND**

a.    **Allegations**

Defendants are an investment advisory firm ("Ambassador") and three of the firm's owners and executive officers ("Individual Defendants"). Plaintiff's Statement of Undisputed Facts, ECF No. 48-2 ("PSUF"), ¶ 1; Defendants' Statement of Disputed Facts, ECF No. 62-1 ("DSDF"), ¶ 1. This case centers on Defendants' business practices between August 15, 2014, and December 31, 2018 (the "relevant period"). PSUF ¶¶ 1, 3; DSDF ¶¶ 1, 3.

During this period, Ambassador managed between 2,600 and 4,300 client accounts, held mostly by individuals, worth a combined total ranging between $270 and $490 million. PSUF ¶ 4; DSDF ¶ 4. Defendants generally had the authority to invest their clients' money at their own discretion and without seeking specific approval from their clients. PSUF ¶¶ 21–24; DSDF ¶¶ 21–24.

Defendants primarily invested their clients' money in mutual funds. PSUF ¶¶ 95–96; DSDF ¶¶ 95–96. Most mutual funds offer a variety of "share classes." Defendants' Statement of Undisputed Facts, ECF No. 42-2 ("DSUF"), ¶ 4; Plaintiff's Statement of Disputed Facts, ECF No. 63-1 ("PSDF"), ¶ 4. Each share class represents the same portfolio of assets and, therefore, has the same underlying value. DSUF ¶ 4; PSDF ¶ 4; PSUF ¶ 66; DSDF ¶ 66. But each share class charges investors different fees in different structures. DSUF ¶ 4; PSDF ¶ 4. For example, Share Class A in Mutual Fund X might charge an upfront fee when an investor purchases the share; Share Class B in the same mutual fund might charge a backend fee only when the investor sells the share; Share Class C might charge recurring fees every year; and Share Class D might charge reduced fees but only be available to certain kinds of preferred investors. PSUF ¶¶ 110–116; DSDF ¶¶ 110–116.

2

Some mutual funds charge a "12b-1" fee on some of their share classes. DSUF ¶ 4; PSDF ¶ 4. Through 12b-1 fees, mutual funds take a portion of an investor's investment and send it back to the investor's broker as a sort of referral fee. DSUF ¶¶ 4–5; PSDF ¶¶ 4–5. But many mutual funds waive this fee for investors who purchase their shares through an investment adviser. PSUF ¶ 102; DSDF ¶ 102.

During the relevant period, Defendants maintained a practice of investing their clients' money in 12b-1 fee bearing share classes even when their clients were eligible for non-12b-1 fee bearing share classes. PSUF ¶ 132; DSDF ¶ 132. The mutual funds in which Defendants invested would collect these 12b-1 fees and then distribute the fees to Defendants' brokers. DSUF ¶¶ 4–5; PSDF ¶¶ 4–5. Defendants had an agreement with one of their brokers, American Portfolios, under which the broker would pass 95% of the 12b-1 fees it received by way of Defendants' trades back to the Individual Defendants. PSUF ¶ 32; DSDF ¶ 32.

As a result, Defendants received two streams of income from their clients. First, Defendants charged their clients an advisory fee that began at 1.25% of the clients' assets under management and decreased as clients increased their assets under management. DSUF ¶ 6; PSDF ¶ 6. Second, Defendants received a stream of 12b-1 fees from the mutual funds they had purchased for their clients through American Portfolio's brokerage. PSUF ¶ 32; DSDF ¶ 32. During the relevant period, the Individual Defendants received more than $1 million in revenue through these 12b-1 fees. PSUF ¶ 39; DSDF ¶ 39. Plaintiff alleges that Defendants generated at least $777,443.43 of these fees by investing in 12b-1 share classes when non-12b-1 share classes were available for the same mutual fund. PSUF ¶ 133.

Critically for Plaintiff's first claim, the parties disagree about whether Defendants' clients were adequately informed that they were effectively paying Defendants additional compensation through 12b-1 fees and that many of these fees could have been avoided.

Defendants also had a written compliance manual that contained all their compliance policies and procedures. PSUF ¶ 248; DSDF ¶ 248. Defendants relied on compliance consultants to ensure the manual contained policies necessary to comply with the Investment Advisers Act and to protect Defendants fiduciary duties. PSUF ¶ 255; DSDF ¶ 255. But Defendants did not ask their compliance consultants to review or update the manual at any point between 2012 and 2018, and no compliance consultants did review or update the manual during that period. PSUF ¶ 256; DSDF ¶ 256. The parties disagree about whether Defendants' compliance manual contained policies that addressed their duties to disclose conflicts of interest, to pursue their clients' best interests, and to achieve best execution of their clients' transactions.

### b.   Procedural History

Plaintiff filed this action on May 13, 2020 alleging that Defendants had violated § 206(2) and § 206(4) of the Investment Advisers Act. *See* Compl. (ECF No. 1). Defendants filed an Answer denying liability and asserting a variety of affirmative defenses. *See* Answer (ECF No. 12).[1] After the close of discovery, both parties moved for summary judgment on all claims. *See* Defendants' Motion for Summary Judgment (ECF No. 47); Plaintiff's Motion for Summary Judgment (ECF No. 48). These motions for summary judgment are presently before the Court.

---

[1] The Individual Defendants and Plaintiff agreed to toll the statute of limitations for Plaintiff's claims for about a year between 2019 and 2020. *See* Compl. ¶¶ 78–80; Answer ¶¶ 78–80.

### III.    LEGAL STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "genuine" when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 618 (3d Cir. 2020). And a fact is material if "it might affect the outcome of the suit under governing law." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party moving for summary judgment must "identify[] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). In response, the nonmoving party must then "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (quoting *Anderson*, 477 U.S. at 252).

In applying this standard, the court must "construe the evidence in the light most favorable to the non-moving party." *Anderson*, 477 U.S. at 255. At the summary judgment stage, the court's role is not to weigh the evidence and determine the ultimate truth of the allegations. *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019). Instead, the court's task is to determine whether there remains a genuine issue of fact for trial. *Id.*

IV.     **ANALYSIS**

Plaintiff claims that Defendants violated both § 206(2) and § 206(4) of the Advisers Act. *See* 15 U.S.C. § 80b-6(2), (4). Defendants argue they have met their obligations under both subsections of the statute and that they are entitled to immunity from liability under § 211(d) because they acted in good faith conformity with the SEC's official actions. The Court will first address Plaintiff's claim under § 206(2), then Defendants' affirmative defense under § 211(d), and then Plaintiff's claim under § 206(4).

   **a.   Section 206(2)**

To prevail on its claim under § 206(2) of the Advisers Act, Plaintiff must prove that Defendants (1) breached a fiduciary duty they owed their clients under the Advisers Act and (2) did so at least negligently. *Sec. & Exch. Comm'n v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 191–92 (1963) ("*Capital Gains*"); *see also Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 17 (1979) ("§ 206 establishes federal fiduciary standards to govern the conduct of investment advisers.") (internal quotation marks omitted).

As fiduciaries, investment advisers owe their clients a duty of loyalty. *Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 135 F.3d 266, 270 (3d Cir. 1998); *Malouf v. Sec. & Exch. Comm'n*, 933 F.3d 1248, 1265 (10th Cir. 2019); *see also Comm'n Interpretation Regarding Standard of Conduct for Inv. Advisers*, Release No. 5248 (June 5, 2019). To fulfil their duty of loyalty, investment advisers must disclose their conflicts of interest, act in their clients' best interest, and seek best execution for their clients' transactions. *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 503 (3d Cir. 2013); *Newton*, 135 F.3d at 270; *Capital Gains*, 375 U.S. at 197. These three duties—conflict disclosure, best interest, and best execution—operate independently,

so Plaintiff need prove Defendants breached only one of them to satisfy the first element of its claim under § 206(2).

### i. Conflict Disclosure

To fulfill their duty of conflict disclosure, investment advisers must make "full and frank" disclosure of any practice that presents a conflict of interest. *Capital Gains*, 375 U.S. at 197. If an investment adviser stands to benefit financially from transacting on behalf of his client, then the adviser must disclose "that benefit and all related details of the transaction." *Belmont*, 708 F.3d at 503. A client's consent to a conflict will not be effective unless the adviser discloses all material facts that would reasonably affect the client's judgment. Restatement (Third) of Agency at § 8.06(1)(a)(ii).[2]

Defendants concede that their 12b-1 compensation scheme presented a conflict of interest. DSUF ¶ 7. Accordingly, Defendants had a duty to disclose this conflict. *Capital Gains*, 375 U.S. 196–97. Defendants argue they satisfied their duty to disclose with their Form ADV brochures and client agreement and with the trade confirmations, client account statements and investment prospectuses that clients received from brokers after transactions had been completed.[3]

---

[2] Defendants cite to *Benzon v. Morgan Stanley Dist., Inc.*, 420 F.3d 598 (6th Cir. 2005), and *Mendell v Greenberg*, 927 F.2d 667 (2d Cir. 1990), to suggest that the inquiry notice disclosure standard applied in those cases should control in this case as well. But, as Plaintiff correctly points out, *Benzon* and *Mendell* concerned the materiality of misstatements under the Securities Act of 1933 and the Securities and Exchange Act of 1934. *See* 420 F.3d at 602; 927 F.2d at 670. Unlike the Advisers Act, the 1933 and 1934 Acts do not impose fiduciary duties. Accordingly, the adequacy of disclosures under the 1933 and 1934 Acts has little bearing on the adequacy of disclosures under § 206(2) of the Advisers Act.

[3] Plaintiff argues the Court should consider only those disclosures made in the Form ADV brochure because the brochure told clients that all conflicts of interest would be disclosed therein. But the Court is unpersuaded by this argument. Defendants' brochure told clients that "[a]ny material conflicts of interest between you and our firm or employees are disclosed in this Disclosure Brochure." Joint Appendix, ECF Nos. 49–54 ("JA"), 918. But this statement does not

Ambassador's company-wide Form ADV brochure makes relevant disclosures in multiple sections. In a section titled "Fees and Compensation," the brochure disclosed the following:

- that Ambassador's advisers were "registered representatives with American Portfolios"

---

suggest that all information *related* to any conflict would be contained within the brochure. This statement promised only that the *existence* of any conflict would be disclosed in the brochure. The Court will demand nothing more of the brochure.

Plaintiff also argues the Court should ignore statements made in trade confirmations, account statements and prospectuses because clients received these documents after the conflicted transactions had taken place. But Plaintiff cites no authority for the proposition that *all* the information necessary to make a disclosure adequately informative must be provided before a transaction takes place. The only relevant authority the Court has found is an SEC Opinion stating that an adviser "may not use its client's assets for its own benefit without prior consent." *In the Matter of Kingsley, Jennison, Mcnulty & Morse Inc. & Richard Kingsley*, 51 S.E.C. 904 (Dec. 23, 1993). But that proceeding did not involve a pre-transaction disclosure that was supplemented after the transaction, so the opinion is not in point.

The common law of agency permits principals to consent to conflicted transactions after they have occurred. *See* Restatement (Third) of Agency § 8.06 cmt. b (contemplating consent "after-the-fact"). And the text of the Advisers Act does not appear to modify this common law rule. In § 206(3), Congress expressly required advisors to make disclosures "before the completion" of a principal or cross-trade transaction. 15 U.S.C. § 80b-6(3). Had Congress wanted advisors to disclose all information necessary to satisfy § 206(2) prior to transacting as well, it would have said so. There might be cases in which pre-transaction disclosures are so lacking that a court should ignore post-transaction disclosures in order to fulfill the Adviser Act's purpose of ensuring that clients have an opportunity to avoid advisers whom they cannot trust. But this is not such a case.

Plaintiff also argues the Court should ignore statements made in the trade confirmations, account statements and prospectuses because Defendants did not themselves draft these documents. But the Court does not see why investment advisors cannot rely on materials prepared by others to provide their clients with the information necessary to make their disclosures fully and fairly informative. The purpose of the §206(2)'s disclosure requirement is to ensure clients have all the information they need to determine whether an investment adviser deserves their trust. *Capital Gains*, 375 U.S. at 196. Requiring advisors to personally prepare all the information related to their conflicts would frustrate this purpose by imposing an unnecessary restriction on advisors who do endeavor to fully inform their clients.

- that these advisers "may receive commission-based compensation in connection with the purchase and sale of securities, including 12b-1 fees";

- that this compensation was "separate and in addition to . . . advisory fees"; and

- that this arrangement "presents a conflict of interest because persons providing investment advice on behalf of our firm . . . have an incentive to effect securities transactions for the purpose of generating commissions rather than solely based on [clients'] needs." JA 917–18.

In a separate section titled "Brokerage Practices," the brochure disclosed that Ambassador's advisers "may . . . recommend the use of American Portfolios" and that the adviser "may receive commissions in addition to any fees that were received for investment advice" as a result of trades placed through American Portfolios. JA 922.

Two pages later in the same section, the company-wide brochure disclosed that advisers who are registered representatives of American Portfolios "*will* recommend American Portfolios" and are subject to rules restricting them "from conducting securities transactions away from American Portfolios." JA 924 (emphasis added). The disclosure proceeded to remind clients that advisers "may earn commission-based compensation as a result of placing the recommended securities transactions through American Portfolios," and that "this practice presents a conflict of interest." JA 924. The disclosure went on to inform clients that they need not use American Portfolios for their transactions but also that refusal to use American Portfolios might prevent Ambassador from accepting the client's account. JA 924.

In sum, through Defendants' company-wide disclosure brochure, a client could have understood that Defendants could gain additional revenue when recommending securities

transactions through American Portfolios and that this opportunity to generate additional revenue represented a conflict of interest.

Defendants' adviser-specific Form ADV brochures largely repeated the disclosures contained in their firm-wide brochure but added some specificity. The brochure for Defendant Young, for example, specified that he "may receive *12b-1 fees* from *mutual funds* that pay such fees" when his clients purchase mutual funds through American Portfolios. JA 966 (emphasis added). When combined with Defendants' company-wide disclosure brochure, the adviser-specific brochure clarified that Defendants could receive additional revenue specifically through mutual fund transactions and in the form of 12b-1 fees in particular.

Defendants' client agreement made additional disclosures. In a section titled "Advisory and Brokerage Fees," the client agreement told clients that they would pay "the compensation of the Company for its services" in accordance with a fee schedule that did not mention 12b-1 fees. JA 594; JA 60:2–13. In the last two sentences of that same section, however, the agreement explained that "mutual funds are subject to internal fees and expenses which are charged against the assets of the mutual fund" and that "these internal charges are an *inherent expense of the Client's account* in addition to the fees and charges contemplated in this Agreement." JA 594 (emphasis added). The agreement also disclosed that its representatives "may be licensed securities representatives of the broker/dealer" and "may receive a portion of the commissions payable to the broker/dealer" but did not specify the form these commissions would take or how large they would be. JA 594. These disclosures could plausibly have informed a client that Defendants' receipt of commissions was a feature of Defendants' fee structure.

The trade confirmations, account statements and prospectuses clients received after transactions supplied a little more information as well. The trade confirmations disclosed the

10

name of the mutual fund, the fund class, the number of shares, and the price of the shares purchased. JA 1155. The account statements cautioned clients to review mutual fund prospectuses to determine the fees being charged. JA 1139. And the prospectuses specified the fees that were being charged as a percentage of dollars invested in each share class and reminded clients that their advisers' receipt of 12b-1 fees could create a conflict of interest. JA 5068. Ostensibly, a client could have combined the information provided in the trade confirmations with the information in the prospectuses and determined exactly how much the client was paying in 12b-1 fees.

Nowhere in Defendants' disclosures, however, did Defendants specify the proportion of a client's 12b-1 fees they were receiving. And nowhere in Defendants' disclosures did they unequivocally state that they *would* be receiving their clients' 12b-1 fees—instead, each disclosure stated only that Defendants "may" receive such fees. Nor did Defendants' disclosures inform their clients that the clients were eligible for non-12b-1 fee bearing share classes or that Defendants were intentionally forgoing those non-12b-1 fee bearing share classes.

Viewing the total mix of Defendants' disclosures, the Court cannot grant summary judgment for either side.

The Court cannot grant summary judgment for Defendants because their disclosures could have been more clear, direct and thorough. Defendants could have provided all the information relevant to their 12b-1 fee compensation scheme in a single, logically sequenced paragraph rather than in sentences scattered throughout Defendants' disclosures. Defendants could also have used a more definite verb than "may" to describe their receipt of 12b-1 fees when they would almost certainly always be receiving those fees. And Defendants could have disclosed the terms of their agreement with American Portfolios in more detail. A reasonable

jury could find that these deficiencies prevented Defendants' clients from understanding Defendants' conflict of interest, so the Court cannot grant summary judgment in favor of Defendants.

Defendants argue, in a similar vein as Amicus Curiae Financial Services Institute, that their disclosures should be adequate as a matter of law because the SEC has not promulgated a rule specifically requiring more detailed disclosures. But Defendants' and Amicus Curiae's arguments misapprehend the nature of Plaintiff's claim and Defendants' own obligations under the Advisers Act. Plaintiff's claim flows directly from the Advisers Act, a statute that made advisers like Defendants into fiduciaries and required them to conduct their businesses accordingly. An adviser cannot evade the statute's requirement to behave like a fiduciary merely because the SEC has not re-articulated or further specified the statute's requirements in a final rule. *Cf. Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 135 F.3d 266, 274 (3d Cir. 1998) (holding that "the district court [is] not deprived of" the authority to enforce the Adviser Act's antifraud provisions "just because no court or regulator [has] previously chosen to exercise such authority with respect to the practice challenged here."). Accordingly, Defendants are not entitled to summary judgment merely because the SEC has not promulgated a final rule requiring more specific disclosures.

But Defendants' disclosures are not so lacking that the Court can grant summary judgment for Plaintiff either.

Plaintiff points to two precedents— *Robare Group, Ltd. v. SEC*, 922 F.3d 468 (D.C. Cir. 2019) and *SEC v. Westport Capital Markets LLC*, 408 F. Supp. 3d 93 (D. Conn. 2019)—to argue that Defendants' disclosures must be inadequate as a matter of law. But this case is not as straightforward as were *Robare* and *Westport Capital*.

12

In *Robare*, an investment adviser had entirely failed to disclose the existence of a conflict of interest. The adviser had formed a revenue sharing agreement in which it would receive payment in proportion to the client funds the adviser invested in certain securities offered by a third party. 922 F.3d at 474. But the adviser's disclosures never mentioned the name of the third party and even contained misleading statements suggesting that it had *not* entered any revenue sharing agreements. Further, after the adviser had amended its disclosures to describe the revenue sharing agreement, the disclosures still failed to specify which transactions or investments would generate extra revenue for the adviser, which prevented clients from understanding when the conflict of interest would be at play. Upon reviewing the adviser's disclosures, the Commission found that they were inadequate to fulfil the adviser's fiduciary duty under § 206(2), and the Court of Appeals for the District of Columbia Circuit concluded that the Commission's findings were supported by substantial evidence. *Id.* at 475–76.

In this case, Defendants' disclosures were not so deficient. Defendants specified that they received commissions, including 12b-1 fees, for mutual fund investments conducted through American Portfolios. JA 966. Defendants also unequivocally informed their clients that the arrangement "presents a conflict of interest because persons providing investment advice on behalf of our firm . . . have an incentive to effect securities transactions for the purpose of generating commissions rather than solely based on [clients'] needs." JA 917–18. And, unlike the disclosures in *Robare*, Defendants' disclosures did not contain any contradictory statements suggesting they would *not* be receiving 12b-1 fees. Accordingly, *Robare* is not perfectly in point.

In *Westport Capital*, an investment adviser had mischaracterized the scope and significance of its conflict of interest. The adviser had a practice of purchasing securities at their initial offerings and then immediately reselling those securities to clients at the higher prevailing

13

market price. 408 F. Supp. 3d at 100. The adviser also received 12b-1 fees for investing its clients' funds in certain mutual funds. *Id.* But the adviser's disclosure brochure stated that the adviser only "may" receive additional revenue from these transactions and also contained contradictory statements suggesting that it did not receive these additional revenues. *Id.* at 101–02. The district court found that no reasonable jury could find these disclosures adequate as a matter of law. *Id.* at 104.

The facts of *Westport Capital* are closer to the facts of this case, but there remain important distinctions. First, the disclosures in *Westport Capital* were much vaguer than Defendants' disclosures—indeed, they never specifically mentioned 12b-1 fees at all. Second, the disclosures in *Westport Capital* contained a contradictory statement suggesting the adviser was not receiving 12b-1 fees. The only potentially contradictory statement in Defendants' disclosures is that Defendants' transaction confirmation forms failed to report 12b-1 fees paid to Defendants in a column tabulating Defendants' commissions received. But these confirmations never stated that Defendants *did not* receive 12b-1 fees, as the disclosures in *Westport Capital* did. Defendants did repeatedly use the word "may" to describe their receipt of additional revenue when "will" would have been a more accurate, much like the adviser in *Westport Capital*.[4] But because Defendants' disclosures had much more specificity and less glaringly contradictory statements than did the disclosures in *Westport Capital*, the Court thinks it best to let the jury

---

[4] Defendants contend that "may" was factually accurate in the context of their business model because they did not conduct all their transactions through American Portfolios and, therefore, did not receive 12b-1 fees on *all* of their mutual fund purchases. But the Court rejects this argument. Defendants' disclosures stated only that they "may" receive 12b-1 fees even for "mutual funds that pay such fees" purchased specifically through American Portfolios. JA 966. In the context of at least this disclosure, "will" would have been more accurate than "may."

determine whether Defendants' use of the word "may" rendered their disclosures inadequately informative.

Plaintiff also argues that Defendants' failure to disclose the amount or magnitude of 12b-1 fees they were receiving renders their disclosures inadequate as a matter of law. But the Court is unpersuaded. Defendants have produced evidence that they informed their clients that the clients might pay 12b-1 fees on mutual fund investments and that Defendants might receive those 12b-1 fees. Defendants have also produced evidence that clients received trade confirmations that specified the size of each of the client's mutual fund investments and prospectuses that specified the 12b-1 fees each mutual fund charged. Construed in the light most favorable to Defendant, these pieces of information could be enough for a client to determine the maximum amount of 12b-1 compensation the client could be paying her adviser through her investments. And it is plausible that an ordinary investor would need only this much information to fully assess the magnitude of the adviser's conflict of interest. Of course, a reasonable jury could very well conclude that Defendants' clients needed a more explicit disclosure of the amount of 12b-1 fees they were paying to Defendants. But the Court cannot hold that such a disclosure was required as a matter of law.

Plaintiff also argues that Defendants' repeated suggestion that they "may" receive 12b-1 fees renders their disclosures inadequate under § 206(2) because the Form ADV instructions required them to use a more accurate verb. But, again, the Court is unpersuaded. It is true that, when an adviser "[has] a conflict or engage[s] in a practice with respect to some (but not all) types of . . . transactions," the Form ADV instructions require the adviser to "say as much rather than disclosing that [he] 'may' have the conflict or engage in the practice." Amendments to Form ADV, Rel. No. 1A-3060 (Jul. 28, 2010), Appendix C at 1. But the Court finds these instructions

only *persuasive* as to what is required under the Adviser Act's fiduciary duties.[5] Accordingly,

the Court understands these instructions to suggest that an adviser will *likely* breach its fiduciary

---

[5] Although the SEC adopted these instructions through notice and comment rulemaking under a statute the SEC is tasked with administering, *see* 15 U.S.C. § 80b-9, none of the parties nor the amicus curiae has addressed whether these instructions should be entitled to administrative deference. And this Court has not been able to find a precedent stating clearly whether Form ADV instructions should be entitled to administrative deference.

Insofar as the Form ADV instructions seek to prescribe the minimum disclosures an investment adviser must make to comply with its fiduciary duties, the instructions represent an agency interpretation of a common law standard. The ordinary rules of administrative deference do not apply to agency interpretations of common law standards. *See Aurora Packing Co. v. N.L.R.B.*, 904 F.2d 73, 75 & n.1 (D.C. Cir. 1990) ("Deference under the *Chevron* doctrine, then, does not apply here because of the . . . congressional direction that . . . the courts apply the common law of agency to the issue.").

Courts defer to administrative interpretations of statutes for two reasons. The first reason is that, by leaving ambiguity in a statute, Congress intends for the statute's enforcing agency to have latitude to resolve policy questions dynamically. The second reason is that, because each agency has a limited and specialized regulatory focus, agencies develop subject matter expertise. Courts defer to agencies in order to leave the policymaking function in the political branches as Congress intended and in order to benefit from agencies' relative expertise. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 865 (1984) ("Judges are not experts in the field, and are not part of either political branch of the Government.").

When Congress incorporates a common law standard into a statute, however, the reasons justifying administrative deference become less compelling. Courts are the primary institutional actors in resolving the policy questions that emerge in developing the common law. And notwithstanding the Supreme Court's holding in *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938), even *federal* courts may engage in developing the common law and may resolve the policy questions that emerge in doing so, especially upon Congress's invitation. *Sosa v. Alvarez-Machain*, 542 U.S. 692, 726 (2004). Further, because courts regularly grapple with common law principles, agencies' relative expertise advantage shrinks. *N.L.R.B. v. United Ins. Co. of Am.*, 390 U.S. 254, 260 (1968) ("It should also be pointed out that such a determination of pure agency law involved no special administrative expertise that a court does not possess.")

Because the justifications for administrative deference carry less force when an agency construes a common law standard, the Court will treat the Form ADV instructions as persuasive, but not binding, interpretations of the standard of disclosure required under § 206(2) of the Adviser Act. *Cf. Browning-Ferris Indus. of California, Inc. v. Nat'l Lab. Rels. Bd.*, 911 F.3d 1195, 1207 (D.C. Cir. 2018) ("[W]e review the [agency's] interpretation of the common law *de novo*."); *Robare*, 922 F.3d at 478 ("[R]egardless of what Form ADV requires, TRG and its principals had a fiduciary duty to fully and fairly reveal conflicts of interest to their clients."). Of course, the SEC has much more experience with the Advisers Act and with the facts of the financial services industry than does this Court, so the Court considers the SEC's interpretations highly persuasive.

duty if it repeatedly uses the word "may" in its disclosures when "will" would be more accurate. But the Court need not, and will not, hold that such a use of "may" will always render a disclosure inadequate under § 206(2) as a matter of law. And while failure to comply with Form ADV instructions might support a claim under § 206(4), Plaintiff has not brought its § 206(4) claim on that theory in this case.

Plaintiff also argues that Defendants' suggestions in their disclosure brochure and client agreement that they would "attempt to minimize the total cost of brokerage services" and that mutual fund fees were an "inherent" expense were misleading. JA 594, 921–22. But while those phrases might have been unhelpful to an unsophisticated investor, they were neither inaccurate nor misleading. 12b-1 fees are charged by the mutual fund itself, so they are not a "cost of brokerage." And Defendants did not suggest that 12b-1 fees are an inherent feature *of mutual funds* but that 12b-1 fees are "an inherent expense *of [the] Client's account*." JA 594 (emphasis added). If anything, this disclosure suggested that Defendants' receipt of 12b-1 fees from mutual funds was part of their business model, which was factually accurate.

Ultimately, the adequacy of Defendants' disclosures depends on whether those disclosures provided clients with the information an ordinary investor would reasonably have needed to understand and consent to Defendants' conflict of interest. Determining the ordinary investor's reasonable needs is quintessentially the jury's function. *Durning v. First Bos. Corp.*, 815 F.2d 1265, 1268 (9th Cir. 1987) ("Like materiality, adequacy of disclosure is normally a jury question."); *Hana Fin., Inc. v. Hana Bank*, 574 U.S. 418, 422 (2015) ("Indeed, we have long recognized across a variety of doctrinal contexts that, when the relevant question is how an ordinary person or community would make an assessment, the jury is generally the decisionmaker that ought to provide the fact-intensive answer."). Because Defendants'

disclosures fall in the gray area between clearly sufficient and clearly insufficient, the Court must leave it to the jury to decide whether Defendants' disclosures were adequate.

### ii. Best Interest & Best Execution

The fiduciary duties under § 206(2) require investment advisers to act in the "best interest" of their clients, which means the adviser must put his client's interests ahead of his own. *Belmont*, 708 F.3d at 503. The fiduciary duties under § 206(2) also require investment advisers to seek "best execution" for all their clients' transactions. *Newton*, 135 F.3d at 270. "Best execution" means obtaining "the most favorable terms reasonably available under the circumstances." *Id.*

But a client, as the principal to a fiduciary relationship, may modify the scope of these duties by giving informed consent to conduct that would ordinarily violate these duties. *See* Restatement (Third) of Agency § 8.06 (2006) ("Conduct by an agent that would otherwise constitute a breach of duty . . . does not constitute a breach of duty if the principal consents to the conduct"); *id.* at cmt. c (providing that "[a] principal may consent to conduct by an agent that would otherwise breach the agent's duty" not to acquire a material benefit from a third party in connection with transactions conducted on behalf of the principal); *Belmont*, 708 F.3d at 503 ("Under the 'best interest' test, an adviser may benefit from a transaction . . . if, and only if, that benefit and all related details of the transaction are fully disclosed."); *Newton*, 135 F.3d at 270 (noting that an agent's duty of best execution can be modified by "instructions to the contrary").[6]

---

[6] Plaintiff resists this conclusion by arguing that the Advisers Act invalidates "[a]ny condition, stipulation, or provision binding any person to waive" an investment adviser's fiduciary duties. 15 U.S.C. § 80b-15(a). But this provision is inapposite. This provision stands for the proposition that general waivers of the Investment Advisers Act's protections will not be enforceable—much as general waivers of fiduciary duties are unenforceable under the common law. Restatement (Third) Of Agency § 8.06, cmt. b ("[A]n agreement that contains general or broad language purporting to release an agent in advance from the agent's general fiduciary obligation to the principal is not likely to be enforceable"). But the question here is whether

Undoubtedly, an investment adviser could breach its best interest and best execution duties by investing a client's money in a 12b-1 fee bearing share class when an otherwise equivalent non-12b-1 share class is available. If the adviser will receive a portion of the 12b-1 fees, then such an investment puts the adviser's interest in receiving 12b-1 fees ahead of the client's interest of maximizing her return. And even if the adviser will not receive a portion of the 12b-1 fees, such an investment would still violate the duty of best execution because it would cause the client to needlessly pay more for an otherwise identical investment. Seen in a vacuum, then, Defendants' investment practice could be found to breach their duties of best interest and best execution.[7]

---

Defendants' clients gave informed consent to a *specific* compensation scheme. Even if the clients have done so, they would not have generally waived Defendants' fiduciary duties. Defendants would still be required to fulfil their fiduciary duties with respect to all conduct that does not fall within the scheme specifically consented to.

[7] Defendants' arguments that it had no duty of best execution for its mutual fund transactions are unpersuasive.

Defendants argue that any duty of best execution was obviated by the fact that their clients selected the brokerage company that would handle the client's transactions. Even accepting Defendants' characterization of their adhesion contract, this argument would fail because the 12b-1 fees at issue were charged by the *mutual funds* that Defendants chose, not by the brokers that executed the trades.

Defendants also argue, much as they did in the context of their duty of conflict disclosure, that there cannot be a duty of best execution because the SEC has never promulgated a rule imposing such a duty on advisers transacting in mutual funds. Again, however, this argument misapprehends the nature of Plaintiff's claims. Plaintiff's claims flow from the Advisers Act itself, a statute that made advisers like Defendants into fiduciaries and required them to conduct their businesses accordingly. An adviser cannot evade the statute's requirement to behave like a fiduciary merely because the SEC has not re-expressed the statute's requirements in a final rule. *Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 135 F.3d 266, 274 (3d Cir. 1998) (holding that "the district court [is] not deprived of" the authority to enforce the Adviser Act's antifraud provisions "just because no court or regulator [has] previously chosen to exercise such authority with respect to the practice challenged here.").

Defendants also argue that there is no duty of best execution for mutual fund transactions because mutual funds do not fluctuate in price throughout the day. But this argument misunderstands the history of the duty of best execution. The duty existed in the common law and applied to all forms of principal-agent relationships long before the Advisers Act made

What remains unclear, however, is whether Defendants obtained their clients' consent to engage in this investment practice. Defendants argue, essentially, that they struck a deal with their clients under which they would collect 12b-1 fees on certain mutual fund investments in exchange for charging their clients a lower advisory fee. And, as discussed above, it remains an open question whether Defendants disclosed enough information to their clients such that their clients could have given informed consent to this arrangement. If Defendants did give their clients enough information to obtain their consent, then Defendants would not have violated their duties of best interest or best execution by following through with the arrangement. But if Defendants failed to obtain their clients' informed consent, then their decision to forgo non-12b-1 share classes certainly would have breached their best interest and best execution duties.

Because there remains a genuine dispute of fact regarding the adequacy of Defendants' disclosures, the Court cannot enter summary judgment for either side on Plaintiff's best interest or best execution theories of breach.

---

investment advisers into fiduciaries. *Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 135 F.3d 266, 270 (3d Cir. 1998). The common law reflected the understanding that principals generally seek to maximize their own economic gain and engage agents to further that purpose. *Id.* Accordingly, the common law required agents to act in a manner that maximized the principal's economic gain. *Id.*

The duty of best execution has evolved in tandem with the evolution of technology and financial products. *Id.* at 271. It is true that, with the advent of computerized trading, a body of law emerged that defined best execution in the context of transactions involving securities with rapidly fluctuating prices. *Id.* But this body of law did not limit the scope of the best execution duty. As agents, investment advisers bear a duty of best execution in *all* the transactions they conduct on behalf of their clients. *Id.* at 270. The specific requirements for achieving best execution might look different in the context of mutual funds than they do in the context of securities with rapidly fluctuating prices, but the duty does not cease to exist for that reason.

### iii. Negligence

An investment adviser violates § 206(2) only if he acts at least negligently in breaching his fiduciary duties. *S.E.C. v. Steadman*, 967 F.2d 636, 643 n.5 (D.C. Cir. 1992) (citing *Capital Gains*, 375 U.S. at 195).

Plaintiff argues that Defendants acted negligently, if not recklessly or intentionally, by failing to follow Form ADV instructions, by ignoring SEC guidance, by ignoring materials from American Portfolios that addressed the propriety of Defendants' investment practices and disclosures, by ignoring notifications sent out by their own compliance consultant describing SEC enforcement actions targeting practices almost identical to Defendants' own, and by violating industry custom and practice. Defendants, for their part, argue that they were not negligent because the SEC had never issued a binding rule prohibiting their practices, their practices conformed to industry custom, and they acted on all the advice they received from compliance consultants. Each side has also produced expert testimony to support its argument.

Because each side has produced competent evidence supporting its arguments on negligence, there remains a genuine dispute of fact as to whether Defendants were at least negligent in their business practices. Accordingly, the Court cannot enter summary judgment for either side on this issue.

### b. Section 211(d)

Defendants also argue that, pursuant to § 211(d), they acted in good faith conformity in reliance on an official Commission action and should, therefore, be immune from liability. *See* 15 U.S.C. § 80b-11(d). But Defendants' argument is unavailing.

To raise the good faith conformity defense, a defendant must first identify a specific agency action on which the defendant relied and to which the defendant conformed its conduct.

*See Valencia v. Anderson Bros. Ford*, 617 F.2d 1278, 1287 (7th Cir. 1980), *rev'd on other grounds,* 452 U.S. 205 (1981) (construing an effectively identical provision under the Truth in Lending Act).

Here, Defendants concede that they did not conform their conduct to a specific SEC action. Defs.' Mem. Law Supp. Mot. Summ. J. (ECF No. 47-1) at 23. Indeed, one of Defendants theories of this case is that there *was no* agency action specifically prescribing how Defendants were supposed to perform their fiduciary duties. And even had Defendants fully complied with the Form ADV instructions, they still could not raise the good faith conformity defense. The final rule promulgating the Form ADV instructions specifically informed advisers that the instructions were not a safe harbor. Amendments to Form ADV, 17 CFR Parts 275, 279, Rel. No. 1A-3060 (Jul. 28, 2010) at 21–22 ("[A]n adviser may have an obligation (independent of [Form ADV]) to disclose material information about its policies . . . where the omission of such information would constitute a breach of the adviser's fiduciary duty."). Had Defendants relied on the Form ADV instructions to fulfill their fiduciary duties, then such reliance would have been unreasonable.

Accordingly, the Court cannot grant summary judgment in favor of Defendants on the basis of the good faith conformity defense.

### c.  Section 206(4)

Plaintiff brings its second claim under § 206(4) of the Advisers Act. This subsection of the Advisers Act creates liability for those who violate antifraud rules promulgated by the SEC under the subsection. Plaintiff alleges Defendants have violated Rule 206(4)-7, which requires investment advisers to "adopt and implement written policies and procedures reasonably designed to prevent violation . . . of the [Advisers] Act," and to review those policies "no less

frequently than annually." 17 C.F.R. § 275.206(4)-7(a), (b). Accordingly, to prevail on its claim under § 206(4), Plaintiff must prove Defendants (1) failed to adopt adequate written compliance policies and procedures and (2) did so at least negligently. *Steadman*, 967 F.2d at 647.

Here, any reasonable jury would find that Defendants violated Rule 206(4)-7. It is undisputed that Defendants maintained a written compliance manual that contained all their compliance policies and procedures. But this compliance manual simply does not contain a policy addressing Defendants' duty to disclose conflicts of interest when investing in mutual funds from which Defendants would receive 12b-1 fees. Defendants point to policies requiring disclosures designed to prevent insider trading, transactions involving securities owned by Defendants, and money laundering. *See* JA 544, 546, 552, 554. But none of these policies address the conflict inherent in selecting mutual fund shares for clients that could generate 12b-1 revenue for Defendants. Indeed, Defendant Young, who was Ambassador Advisor's chief compliance officer, conceded that Defendants did not maintain a written policy addressing disclosure of conflicts related to 12b-1 fees. JA 211:11–17.

Similarly, the manual does not contain any policy addressing Defendants' duty to act in their clients' best interest. Instead, the manual simply contains a directive that Defendants and their employees "must scrupulously avoid serving their own personal interests ahead of the interests of the Company's Advisory Clients." JA 516. But this directive is not reasonably designed to prevent breaches of Defendants' fiduciary duty. Indeed, this directive does not specify *any* steps Defendants or their employees should take the ensure compliance with their fiduciary duty. Accordingly, this lone statement cannot constitute a policy that would satisfy the requirements of Rule 206(4)-7.

Even if Defendants prevail in showing that their clients consented to their receipt of 12b-1 fees, Defendants would still have needed policies addressing their duties of conflict disclosure and best interest in the context of mutual fund share class selection. With their clients' consent, Defendants would not necessarily breach their fiduciary duty by purchasing a share class bearing 12b-1 fees. But Defendants would still have to make decisions between investing in mutual funds available through American Portfolio's brokerage—for which Defendants would receive 12b-1 fees—and mutual funds not available through American Portfolios that might represent a better investment—for which Defendants would not receive 12b-1 fees. These decisions would be difficult for an adviser to navigate while preserving the primacy of the client's interest, and Rule 206(4)-7 required Defendants to adopt a written policy to help Ambassador's employees navigate these decisions.

Nor does the manual contain a policy that adequately addresses Defendants' duty to achieve best execution in mutual fund transactions. Defendants reproduced their Form ADV disclosure brochure in their compliance manual, and the only statements in the manual on the duty best execution comes from the reproduced Form ADV disclosure brochure. Specifically, the brochure states that Defendants will achieve best execution by "execut[ing] most trades" through "Schwab" to "minimize [clients'] trading costs." JA 586. But Defendants did not execute most trades through Schwab and actually maintained a business model that incentivized them to conduct most of their trades through American Portfolios. Given that Defendants' business model strongly incentivized Defendants to steer trades away from Schwab and toward American Portfolios, this policy cannot be considered "reasonably designed" to safeguard Defendants' duty of best execution.

This policy also does nothing to ensure best execution in the process of selecting among mutual fund share classes. Even if Defendants obtained their clients' consent to invest in 12b-1 fee bearing mutual fund share classes, Defendants would still have owed their clients a duty to select the 12b-1 fee bearing share class that minimized all other fees. Defendants' policy manual simply provides no guidance for how Defendants would ensure they were picking the optimal share class for their clients. Indeed, Defendant Young also conceded that there was no written policy addressing the achievement of best execution in mutual fund share class selection. JA 211:7–17.

Defendants' complete failure to adopt any written policy addressing its duties of conflict disclosure, best interest and best execution in the context of mutual fund transactions was at least negligent. Defendants were aware that they were required to adopt written policies to ensure compliance with their fiduciary duties and to review those policies at least annually. PSUF ¶¶ 245–247; DSDF ¶¶ 245–247. As a registered representative of American Portfolios, Defendant Young received and read copies of American Portfolios' compliance manual, which contained detailed policies on mutual fund share class selection. PSUF ¶¶ 201, 204–07; DSDF ¶¶ 201, 204–07. But Defendant Young, despite being Ambassador Advisor's chief compliance officer, failed to adopt similar policies for Ambassador or to even so much as ask Ambassador's compliance consultant about the advisability of such policies. PSUF ¶¶ 208–09; DSDF ¶¶ 208–09.

Defendants seek to avoid a finding of negligence by arguing that they relied on compliance consultants to ensure their manual contained policies necessary to comply with the Advisers Act. But Defendants concede that they did not ask their compliance consultants to review or update the manual *at any point* between 2012 and 2018. PSUF ¶ 256; DSDF ¶ 256.

25

Defendants cannot shift the blame to their compliance consultants when Defendants did not even seek their consultants' input during the relevant period or the two years preceding it.

Because Defendants completely failed to adopt any policies addressing the issues presented by its practice of investing clients' money in mutual funds from which it would receive 12b-1 fee compensation, any reasonable jury would find that Defendants violated Rule 206(4)-7 and did so at least negligently. Accordingly, the Court must enter summary judgment in favor of Plaintiff on its claim under § 206(4).

## V.      CONCLUSION

There remains a genuine dispute of fact as to whether Defendants' disclosures were adequate to obtain their clients' informed consent to Defendants' 12b-1 fee compensation arrangement. For this reason, the Court cannot grant summary judgment for either side on Plaintiff's claim under § 206(2). Further, Defendants have failed to show that they conformed their conduct to any specific SEC rule, regulation or action, so the Court cannot grant summary judgment in favor of Defendants on the basis of their affirmative defense under § 211(d).

But Plaintiff has caried its burden to show that there is no genuine dispute of fact about whether Defendants adopted written policies adequate to satisfy SEC Rule 206(4)-7 and that Plaintiff is entitled to judgment in its favor as a matter of law. Accordingly, the Court grants summary judgment in Plaintiff's favor on its claim under § 206(4).


                              BY THE COURT:


                              */s/ John M. Gallagher*
                              JOHN M. GALLAGHER
                              United States District Court Judge