IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>　　　　　Plaintiff,<br><br>　　　v.<br><br>AMBASSADOR ADVISORS, LLC, *et al.*,<br>　　　　　Defendants. | :<br>:<br>:<br>:<br>:　Civil No. 5:20-cv-02274-JMG<br>:<br>:<br>: |

**MEMORANDUM OPINION**

**GALLAGHER, J.**                                                                                                   **December 21, 2021**

**I.      OVERVIEW**

Plaintiff has sued Defendants for violating the Investment Advisers Act of 1940 and a rule that the Securities and Exchange Commission promulgated under that statute. To prevail on their claims, Plaintiff must establish that Defendants violated the fiduciary duties they owed their clients, failed to adopt written policies and procedures to ensure performance of those fiduciary duties, and did both at least negligently.

Plaintiff and Defendants both seek to introduce expert testimony to assist the jury in evaluating Defendants' alleged negligence. Plaintiff offers Marti P. Murray, a retired investment advisor and litigation consultant, as its expert. Defendants offer Jonathan R. Macey, a professor of corporate law, corporate finance and securities law, as their expert. Each party has filed a *Daubert* motion seeking to preclude the opposing party's expert from testifying. *See* ECF Nos. 46, 60.

The parties' *Daubert* motions are presently before the Court. For the reasons that follow, the Court denies Defendants' motion and grants Plaintiff's motion only in part.

## II. BACKGROUND

The background facts and procedural history of this case are set forth in detail in the Court's memorandum opinion addressing the parties' cross-motions for summary judgment.

## III. LEGAL STANDARD

Under the Federal Rules of Evidence, district courts must act as the gatekeepers of expert testimony. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999); Fed. R. Evid. 702. Before testimony can reach the jury under the cloak of expertise, the Court must evaluate it for three criteria: qualification, reliability and fit. *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832 (3d Cir. 2020).

A witness is *qualified* to provide expert testimony only if the witness has "specialized expertise" in the testimony's subject matter. *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). A witness's testimony is *reliable* only if it is founded upon "good grounds." *UGI Sunbury LLC*, 949 F.3d at 834; Fed. R. Evid. 702 (requiring that expert testimony be "based on sufficient facts or data" and be derived from "reliable principles and methods" that have been "reliably applied . . . to the facts of the case."). And a witness's testimony *fits* a case only if it would help the trier of fact to understand the evidence or determine a fact in issue. *UGI Sunbury LLC*, 949 F.3d at 835 (quoting Fed. R. Evid. 702); *see also United States v. Ford*, 481 F.3d 215, 219 n.6 (3d Cir. 2007) ("[F]it is [primarily] a relevance concern.") (internal quotation marks omitted).

The Rules of Evidence reflect a liberal policy of admissibility, even for expert testimony. *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008). But expert testimony must satisfy the requirements set out above to be admissible. *UGI Sunbury LLC*, 949 F.3d at 832–33. The burden to

establish that each requirement is satisfied by a preponderance of the evidence rests with the party offering the expert testimony. *See Padillas v. Stork–Gamco, Inc.,* 186 F.3d 412, 418 (3d Cir.1999).

IV. **ANALYSIS**

    a. **Plaintiff's Expert**

Plaintiff's Expert, Marti P. Murray, offers five opinions in her expert report and four in her rebuttal report. Defendants seek to preclude Ms. Murray from testifying on any of these opinions.

        i. **Qualification**

There is no question that Ms. Murray is qualified to be an expert on the issue of custom and practice in the investment advising industry. Ms. Murray has spent over 39 years working in and around the industry of investing other peoples' money. She has earned an MBA in Finance from New York University's Stern School of Business, worked as an analyst and portfolio manager for multiple major investment funds, founded her own SEC-registered investment advisory, served as a litigation expert in various matters involving the regulation of investment advisors, and co-taught classes in finance as an adjunct professor at the NYU Stern School of Business. Expert Rep. of Marti P. Murray ("Murray Report"), ECF No. 46-2, ¶¶ 1–15. During the 14 years from 1995 to 2008, Ms. Murray had ultimate responsibility for managing her investment advisory's compliance practices—the very kind of practices that are at issue in this case. Murray Report ¶ 7. After retiring from investment advising, Ms. Murray continued to review compliance customs and practices through her role as a litigation expert. Murray Report ¶¶ 8–9. Given Ms. Murray's extensive experience participating in and studying the compliance customs and practices of the investment advising industry, she is amply qualified to testify as an expert on the subject.

        ii. **Reliability**

Defendants object, however, that Ms. Murray's testimony about the compliance practices surrounding mutual fund investments and 12b-1 fees is not reliable because Ms. Murray spent

much of her career specializing in distressed debt investments and because Ms. Murray retired before the SEC began bringing enforcement actions involving 12b-1 fees.

These arguments are unpersuasive. Ms. Murray intends to testify about the compliance practices investment advisors maintain to protect the advisor-client relationship. Murray Report ¶¶ 18–19. This relationship and the duties that flow from it remain the same no matter the type of investment the advisor pursues. Further, an expert's specialization does not render the expert incapable of testifying to general principles. *Dychalo v. Copperloy Corp.*, 78 F.R.D. 146, 149 (E.D. Pa. 1978). If Defendants believe that Ms. Murray's specialization in distressed debt or the time of her retirement limits the value of her testimony, then they should pursue that issue through cross-examination and by putting on contrary evidence. *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

### iii. Fit

Defendants also argue that Ms. Murray's testimony does not fit this case because it contains legal conclusions that usurp the Court's role in instructing the jury in the applicable law. Specifically, Defendants argue that Ms. Murray's testimony reaches legal conclusions as to whether certain transactions are conflicted, whether certain disclosures and written policies are adequate, whether Defendants did in fact seek best execution for their clients, and whether Defendants actions were reasonable. Plaintiffs respond that Ms. Murray is simply testifying to industry custom and practice and does not usurp the Court's role in doing so.

The Court shares Defendants' concern about the phrasing of Ms. Murray's opinions. Although testimony is not objectionable merely because it embraces an ultimate issue in the case, Fed. R. Evid. 704, experts cannot offer legal conclusions as to whether a party's conduct comports with the law, *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006). Many of Ms.

Murray's opinions use the same terms of art and legal phrases that the jury will be required to apply in this case. *See* Murray Report Op. 1 (opining as to what a "reasonable investment adviser" would know); *id.* Op. 2 (concluding that Defendants' investments "were conflicted transactions"); *id.* Op. 3 (concluding that Defendants' disclosures were "inadequate"). Taken at face value, these opinions might sound to the jury like conclusions of law. It is the jury's role to apply the law to the facts, and the Court is wary of expert testimony that could induce the jury to surrender its role to a party's expert.

But the Court concludes that Ms. Murray's testimony will be admissible so long as she refrains from framing her opinions as legal conclusions and instead testifies as to whether Defendants' conduct comports with industry custom and practice. It is well-settled that experts may testify to an industry's customs and practices. *United States v. Fumo*, 655 F.3d 288, 303 (3d Cir. 2011), *as amended* (Sept. 15, 2011). And an expert may compare a party's conduct to those customs and practices. *Id.*; *see also Ke v. Liberty Mut. Ins. Co.,* 2021 WL 5203150, at *3 (E.D. Pa. Nov. 9, 2021) (explaining that "experts typically testify about industry customs and practices" by "compar[ing] and contrast[ing] industry practices to the facts before them"). Of course, the line between custom and legal duty can be blurry in highly regulated industries because customs in such industries often evolve to comport with the legal frameworks that constrain them. *Berckeley*, 455 F.3d at 218. But this blurriness does not preclude experts from testifying to custom and practice. *Id.*; *see also Micron Tech., Inc. v. Rambus Inc.*, 2007 WL 9771152, at *2 (D. Del. Aug. 29, 2007) ("The fact that a particular custom or practice is shaped by, or overlaps with, what the law requires does not impact an expert's ability to testify."). Instead, it simply requires the parties and the Court take extra precaution to ensure the jury understands the purpose of the expert's testimony. *Fumo*, 655 F.3d at 298.

Accordingly, the Court will not preclude Ms. Murray from testifying, but Ms. Murray must make clear that she is measuring Defendants' conduct against only industry custom and practice, as she does in her fourth and fifth opinions. *See* Murray Report at 14 ("Defendants' purchase . . . was inconsistent with sound industry custom and practice"); *id.* at 22 ("Ambassador's written policies and procedures were inconsistent with sound industry practice"). Defendants may also request a limiting instruction at trial to further ensure the jury understands the purpose of Ms. Murray's testimony.

Defendants also argue that Ms. Murray's testimony does not fit this case because it seeks to usurp the Court's role in instructing the jury in the applicable law. Defendants point to portions of Ms. Murray's report that define legal concepts like fiduciary duties, conflicts of interest, and disclosure requirements. *See, e.g.*, Murray Report ¶¶ 20, 25, 27, 73, 119, 193. For reasons similar to the ones set forth in the preceding paragraphs, the Court rejects Defendants' argument but with a word of caution. As an expert in industry custom and practice, Ms. Murray can testify to the ways in which industry custom and practice are shaped by legal frameworks. *See Fumo*, 655 F.3d at 303 ("These customs and practices will sometimes include applicable legal regulations, such as registration requirements for securities registration under the Securities Acts or Medicaid rules.") (internal citations omitted). She cannot, however, testify to the law that should govern this case. *Berckeley*, 455 F.3d at 217. Accordingly, Ms. Murray may describe the regulatory framework that surrounds the investment advising industry in order to describe the customs and practices that arise from that framework. But her testimony will be inadmissible if she strays into offering opinions as to the legal duties Defendants had in this case or as to whether Defendants satisfied those legal duties.

Defendants also argue that Ms. Murray's testimony should be excluded because it recites Plaintiff's preferred factual narrative and because Ms. Murray, by describing some of Defendants'

conduct as "deliberate," "intentional," or "interested," opines as to Defendants' state of mind.

But these arguments misconstrue Ms. Murray's report. Ms. Murray's references to the facts in the record reflect her attempt to demonstrate the factual basis for her opinions. Similarly, Ms. Murray's references to Defendants' "deliberate" or "intentional" acts are generally paraphrases of Defendants' deposition testimony. And in describing Defendants as "interested," Ms. Murray was describing the objective circumstances that surrounded Defendants' relationships with their clients rather than describing Defendants' subjective interests.

The Court sees no reason to preclude Ms. Murray from testifying simply because she has included these statements in her report. If, at trial, Ms. Murray begins to recite facts that bear no relation to the opinions she offers or opine as to Defendants' mental state, the Court will welcome an objection. But it would be premature at this stage to preclude Ms. Murray from testifying simply because she has provided the factual basis for the opinions she offers.

Defendants also argue that Ms. Murray's opinions lack relevance because, in a few paragraphs of her report, Ms. Murray cited to a standard of care drawn from § 206(3) of the Advisers Act rather than from the provisions at issue in this case. *See, e.g.*, Murray Report ¶ 127 n.169. But the Court rejects this argument. As discussed above, Ms. Murray cannot testify as to the standards of care the law requires. Instead, she can testify only to the standards industry participants have established through custom and practice. So long as those customary standards apply to the industry participants like Defendants, it makes little difference whether Ms. Murray understands the standards as stemming from § 206(3) or § 206(2). Ms. Murray is a practice and custom expert, not a legal expert, so the Court will not preclude her from testifying merely because she cited to inapposite legal authority. If Defendants believe that Ms. Murray's citation to inapposite authority reduces her credibility, or if Defendants believe that the standard Ms. Murray articulates does not reflect industry custom and practice, then Defendants are free to explore those

issues through cross-examination or by introducing their own, countervailing expert testimony.

Accordingly, the Court finds that Ms. Murray's professional experience qualifies her as an expert in the customs and practices of the investment advising industry, that her testimony is reliable, and that her testimony fits this case. As such, the Court denies Defendants' *Daubert* motion.

### b. Defendants' Expert

Defendants' expert, Jonathan R. Macey, offers five opinions in his expert report. Plaintiff seeks to preclude Professor Macey from offering any of these opinions to the jury.

#### i. Qualification

Plaintiff argues that Professor Macey lacks the expertise necessary to be qualified as an expert. Professor Macey, Plaintiff argues, has never worked in the investment advising industry, has never had to draft or approve disclosures on behalf of an investment advising company, and has limited experience writing about investment advisers and the Investment Advisers Act.

But the Court rejects Plaintiff's argument. Most of Plaintiff's arguments go toward Professor Macey's lack of familiarity with the customs and practices of the investment advising industry. But Professor Macey is not offering custom and practice testimony. Macey Dep. (ECF No. 60-4) at 206:4–13. Instead, Professor Macey is an expert on the legal framework that shapes the investment advising industry. And while Professor Macey's academic interests embrace issues beyond investment advisories and the Investment Advisers Act, he has written at least one book containing some discussion of the regulation of investment advisers and has taught classes that covered the Investment Advisers Act and the duty of best execution. Macey Dep. at 84:20–25, 92:12–23, 93:25–94:21. It makes little difference that Professor Macey's writings have not been subjected to peer review, as peer review is uncommon in the legal academy. *See Kumho Tire*, 526 U.S. at 138 (holding that the *Daubert* factors, such as peer review, will be inapplicable in some

cases). Professor Macey's academic background is enough to satisfy the Federal Rules of Evidence's liberal standard for qualification as an expert. *Schneider*, 320 F.3d at 404 ("[A] broad range of knowledge, skills, and training qualify an expert.")

### ii. Reliability & Fit

Plaintiff raises a bevy of objections to the reliability and fit of each of Professor Macey's opinions. The Court will address each objection in turn.

Plaintiff argues that Professor Macey's opinion that the SEC has "long taken a holistic approach to disclosure" does not fit this case because it is irrelevant. *See* Expert Report of Jonathan R. Macey ("Macey Report"), ECF No. 60-3, at 8. But the Court disagrees. To prevail in this case, Plaintiff must prove that Defendants acted negligently. If the SEC's current disclosure expectations depart from historical practice, then that fact could tend to show that Defendants could have reasonably believed their disclosures were legally adequate. Fed R. Evid. 401.

But the Court agrees with Plaintiff that Professor Macey's opinion that it would be "appropriate" to evaluate Defendants' disclosures "holistic[ally]" in this case is unhelpful because it usurps the roles of the Court and the jury. Macey Report Op. 1. It is the Court's duty to instruct the jury in what the law requires of Defendants in this case. And the jury is capable of deciding what weight, if any, to give each document without the aid of expert testimony. After all, in this case the jury is tasked with determining how an *ordinary investor* would have understood Defendants' disclosures. *See Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 503 (3d Cir. 2013); Restatement (Third) of Agency at § 8.06(1)(a)(ii). The jury, being a cross-section of society, is better positioned to determine how an ordinary investor would understand Defendants' disclosures

than is an expert in securities regulation. Accordingly, Professor Macey may not offer an opinion as to how the jury should evaluate the disclosure documents in this case.

The Court also agrees with Plaintiff that Professor Macey's recitation of the documents containing disclosure statements does not fit this case. Quite simply, the jury can review the evidence in the record themselves. Professor Macey's recitation of the evidence would serve no purpose but to impermissibly bolster that evidence. *See R.D. v. Shohola, Inc.*, 2019 WL 3801455, at *2 (M.D. Pa. Aug. 13, 2019) ("While [an expert's] recitation of [the] factual testimony may add a certain academic cachet to this evidence, it is not proper expert testimony."). Further, Professor Macey is not an expert on industry custom and practice but an expert on securities regulation. Were he to review the evidence in this case, the only thing he could compare it to would be the applicable securities law. But that is the jury's role—not Professor Macey's. Accordingly, Professor Macey may neither recite the documents he believes serve as sources of disclosure in this case nor opine as to those documents' significance, as he does in paragraphs 30 through 59 of his report.

Plaintiff also moves to exclude Professor Macey's opinions that the SEC has not issued "rules, regulations, guidance or statements" identifying the material facts an adviser must disclose when investing in 12b-1 fee bearing mutual funds or defining a theory of best execution in the context of mutual funds bearing 12b-1 fees. *See* Macey Report, Ops. 2 & 4. Plaintiff argues that these opinions are irrelevant because this suit is being brought under the Investment Advisers Act itself.

But the Court disagrees. Plaintiff is correct that Defendants could still have breached their fiduciary duties under the Investment Advisers Act even though the SEC has not promulgated a rule specifically prescribing how Defendants should have behaved. But, as discussed above, Defendants will only be *liable* if their breach was negligent. If the SEC had promulgated rules prescribing in detail how Defendants should have behaved, then that would be strong evidence that

Defendants should have known their conduct fell short of their fiduciary duties, which would tend to prove that their breach was at least negligent. By that same logic, however, the absence of any specific guidance from the SEC would tend to suggest that Defendants could reasonably not have known their conduct fell short of their fiduciary duties. Again, Professor Macey's testimony is not conclusive on the issue of Defendants' negligence. But it does have some tendency to show that they were not negligent, and that is all the Federal Rules of Evidence require. Fed. R. Evid. 401. Accordingly, Professor Macey may draw from his familiarity with securities regulation to testify as to whether the SEC had issued rules or guidance relevant to the subject matter of this suit prior to Defendants' conduct.

      The Court agrees with Plaintiff, however, that Professor Macey should not be permitted to opine that "consistency and predictability in regulatory enforcement are of paramount importance" or that "lack of consistency and predictability" will have negative consequences for the SEC. Macey Report, Ops. 2 & 4. These public policy opinions simply have no bearing on the issues involved in this case. The jury is not tasked with deciding whether the SEC's enforcement decisions are institutionally optimal. Instead, they must decide whether Defendants negligently breached their fiduciary duties under the Investment Advisers Act. Professor Macey's public policy opinions might be well-suited for an amicus brief or a comment submitted during an SEC rulemaking, but they are not appropriate for expert testimony at trial. Accordingly, Professor Macey may not offer these opinions to the jury. *See Robinson Mech. Contractors Inc. v. PTC Group Holdings Corp.*, No. 15-cv-77, 2017 WL 3838627, at *2 (E.D. Mo. Sept. 1, 2017), *amended and superseded on other grounds by* 2017 WL 3970602 (E.D. Mo. Sept. 8, 2017) ("Macey may not testify about legal standards and public policy.").

      Plaintiff also argues Professor Macey's opinion that 12b-1 fees could provide some benefits to small investors as a class should be excluded as either unreliable or irrelevant. Macey Report,

11

Op. 3. The Court agrees. Professor Macey testifies that 12b-1 fees theoretically benefit investors in that they allow investors to pay marketing, distribution and account service costs over time and increase investors' access to mutual funds and investment advice from intermediaries. See Macey Report ¶¶ 71–73. If Professor Macey's testimony reflected an *economic fact*—that is, if Macey were testifying that Defendants' clients actually received these benefits by paying 12b-1 fees—then the testimony would be relevant to whether Defendants satisfied their duty to act in their clients' best interest. But Professor Macey has no expertise in economics or in the factors that govern supply, demand and pricing in financial markets. Nor did Professor Macey conduct any economic analysis to support his opinions regarding the potential benefits of 12b-1 fees. Macey Dep. 231:7–232:19. Accordingly, Professor Macey cannot be testifying to an economic fact—certainly not in a manner reliable enough to warrant admission into evidence. And insofar as Professor Macey is testifying to the theoretical policy justification for 12b-1 fees, his testimony has no relevance to this case—the propriety of 12b-1 fees is not on trial in this case. Accordingly, Professor Macey may not offer any opinion as to the propriety or theoretical benefits of 12b-1 fees.

Plaintiff also argues that Professor Macey's testimony that the "SEC is of the opinion that [12b-1] fees should not be permitted" and that "the SEC has tried to ban 12b-1 fees for three decades" should be excluded because it seeks to establish Plaintiff's state of mind. Macey Report ¶¶ 67, 70. The Court agrees. Experts may not testify to a party's state of mind. *Zimmer Surgical, Inc. v. Stryker Corp.*, 365 F. Supp. 3d 466, 497 (D. Del. 2019) ("Expert testimony as to intent, motive, or state of mind offers no more than the drawing of an inference from the facts of the case . . . and permitting expert testimony on this subject would be merely substituting the expert's judgment for the jury's and would not be helpful to the jury.") (internal quotation marks omitted). Further, this testimony is simply irrelevant. Plaintiff's feelings about 12b-1 fees and its motivation for bringing this suit have no bearing on the question of whether Defendants negligently breached

their fiduciary duties under the Advisers Act. Accordingly, Professor Macey may not opine as to the SEC's feelings about 12b-1 fees or motivation for bringing this suit.

Finally, Plaintiff asks this Court to preclude Professor Macey from testifying that Defendant Ambassador Advisor's corporate governance was directed at instilling a culture of compliance in the firm and that the SEC had never raised an objection related to the firm's receipt of 12b-1 fees during its site inspections over the 17 years preceding and including the time at issue in this suit. The Court grants this request because Professor Macey's testimony on these issues would neither have a sufficient factual basis nor be the product of a reliably applied methodology.

Professor Macey opines that Ambassador's corporate governance was directed at instilling a culture of compliance in the firm because Ambassador hired competent compliance consultants. Macey Report, Op. 5. But Professor Macey did not undertake any independent investigation into whether Defendants' compliance consultant was, in fact, competent. Professor Macey seeks to support his opinion by citing other witnesses' opinions that Defendants had good compliance practices. *See, e.g.*, Macey Report ¶¶ 89–97. But Professor Macey made no effort to verify whether these other witnesses had a sound foundation for their opinions—instead, he simply takes them at their word. *Id.*; *see also* Macey Dep. at 199:4-203:15, 265:23-266:12. As a result, Professor Macey's testimony is merely an uncritical recitation of Defendants' evidence. Such a recitation is too unreliable to warrant the cloak of expertise. *See R.D. v. Shohola, Inc.*, 2019 WL 3801455, at *2 (M.D. Pa. Aug. 13, 2019) ("While [an expert's] recitation of [the] factual testimony may add a certain academic cachet to this evidence, it is not proper expert testimony.").

Further, Professor Macey testifies that the SEC never raised an issue regarding Defendants' collection of 12b-1 fees during any of the SEC's site inspections. Macey Report, Op. 5; *id.* ¶¶ 9, 98. But Professor Macey's deposition testimony reveals that he knows very little about the SEC inspections that occurred or their results. He was not sure how many times, if at all, the SEC

13

inspected Defendants' premises during the period at issue in this case. He did not review the letters the SEC sent to Defendants summarizing the results of their inspections. Nor did he know the actual scope of the SEC's inspections or whether those inspections were intended to address issues related to 12b-1 fees. Macey Dep. at 281:23-289:23. Professor Macey's lack of knowledge about these inspections makes his testimony about them unreliable.

Accordingly, Professor Macey may not offer an opinion as to the quality of Defendants' corporate governance practices or testimony about the SEC's inspections of Defendants.

In sum, the Court finds that Professor Macey's academic experience qualifies him as an expert in the legal framework surrounding the investment advising industry. But the Court finds that many portions of his offered expert opinions, specified in the preceding paragraphs, are unreliable or do not fit this case. As such, the Court grants Defendants' *Daubert* motion in part.

V. **CONCLUSION**

Because the Court finds Ms. Murray qualified to be an expert and finds her testimony both to be reliable and to fit the case, the Court denies Defendants' *Daubert* motion to exclude Ms. Murray's testimony. But the Court cautions Plaintiff that Ms. Murray is an expert in custom and practice. She should make clear that she is comparing Defendants' conduct to industry customs and practices rather than to legal requirements. And she should discuss legal requirements only insofar as they shape industry custom and practice.

Because the Court finds Professor Macey qualified but finds some of his offered testimony unreliable or lacking in fit, the Court grants Plaintiff's *Daubert* motion in part. Professor Macey may not opine as to how the jury should evaluate the evidence, as to which documents the jury should consider to be disclosures, as to the theoretical or economic benefits of 12b-1 fees, as to the SEC's motive for bringing this suit, as to the quality of Defendants' culture of compliance and

corporate governance, or as to his understanding of the SEC's inspections of Defendants' office. And Professor Macey may not offer public policy opinions.

                        BY THE COURT:

                        */s/ John M. Gallagher*
                        JOHN M. GALLAGHER
                        United States District Court Judge