IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>           Plaintiff,<br><br>           v.<br><br>AMBASSADOR ADVISORS, LLC, *et al.*,<br>           Defendants. | Civil No. 5:20-cv-02274-JMG |

**MEMORANDUM OPINION**

**GALLAGHER, J.**                                                                                                    September 7, 2022

**I.     OVERVIEW**

The Securities and Exchange Commission (the "SEC") brought this civil enforcement action against Defendants to enforce the Investment Advisers Act of 1940 (the "Advisers Act"). Specifically, the SEC claimed Defendant Ambassador Advisors violated § 206(4) of the Advisers Act and all Defendants violated §206(2). The Court entered summary judgment against Defendant Ambassador Advisors on the claim under § 206(4), and a jury returned a verdict against all Defendants on the claim under § 206(2).

The SEC now moves for the entry of final judgment against each Defendant. The SEC asks the Court to enjoin Defendants from future violations of the securities laws, to order disgorgement of $622,642 and prejudgment interest of $166,520, to impose $1,244,188 in civil penalties, and to order Defendants to remove certain information from their website and to send certain written notices to their clients. Defendants, for their part, argue that there should be no consequences at all for their violations of the Advisers Act.

For the reasons that follow, the Court will deny the SEC's request for a permanent injunction, but the Court will grant the SEC's request for disgorgement and prejudgment interest, will impose a total of $1,245,284 in civil penalties, and will order Defendants to remove certain misleading statements from their website and to send corrective notices to their clients.

## II.  FACTUAL BACKGROUND

The Court has discussed the background of this case in detail in its opinion resolving the parties' cross-motions for summary judgment. *See* ECF No. 73 at 2–4. But the essential facts are as follows.

Defendants are an investment advisory firm ("Ambassador") and three of the firm's owners and executive officers ("Individual Defendants"). This case centers on Defendants' business practices between August 15, 2014, and December 31, 2018 (the "relevant period").

During this period, Defendants primarily invested their clients' money in mutual fund share classes that charged "12b-1" fees even when their clients were eligible for identical share classes that did not charge these fees. The mutual funds in which Defendants invested would collect these 12b-1 fees and then distribute the fees to Defendants' brokers. One of Defendants brokers would then pass 95% of the 12b-1 fees it received by way of Defendants' trades back to the Individual Defendants.

As a result, the Individual Defendants received two streams of income from their clients. First, Defendants charged their clients an advisory fee that began at 1.25% of the clients' assets under management and decreased as clients increased their assets under management. Second, the Individual Defendants received a stream of 12b-1 fees from the mutual funds they had purchased for their clients through their primary broker. During the relevant period, the Individual Defendants received more than $1 million in revenue through these 12b-1 fees.

The SEC claimed that Ambassador violated § 206(4) by failing to maintain policies and procedures designed to safeguard Defendants' fiduciary duties as required by SEC Rule 206(4)-7. Defendants disputed this claim by pointing to a sundry of policies designed to address conflicts of interest in other areas of securities transactions. The Court rejected this defense and entered summary judgment against Ambassador on the claim under § 206(4).

The SEC also claimed that Defendants had violated § 206(2) by maintaining a 12b-1 fee scheme that ran counter to Defendants' fiduciary duties. Specifically, the SEC claimed Defendants had failed to act in their clients' best interest, had failed to achieve best execution, and had failed to adequately disclose the conflict of interest inherent in the 12b-1 scheme to their clients. Defendants resisted this claim by arguing, among other things, that they had adequately disclosed their 12b-1 scheme to their clients and that their clients had consented to the scheme. The jury rejected Defendants' informed consent defense and returned a verdict finding them liable for violating § 206(2) of the Advisers Act.

After the jury returned its verdict, Defendants' released a video and statement in which they acknowledged that a jury found them liable for violating § 206(2) of the Advisers Act. In this same video and statement, however, Defendants deflected blame for their violations of the Advisers Act, claiming that they had "followed the SEC's [disclosure] instructions, precisely," and contradicted the jury's verdict, claiming "clients were never overcharged, nor were gains or returns compromised in any way." *See* ECF No. 172-3, Ex. 1.

The SEC has now moved for an entry of a final judgment imposing certain fines and equitable remedies against each Defendant. The SEC's motion is presently before the Court.

**III.  ANALYSIS**

The SEC asks the Court to permanently enjoin Defendants from violating securities laws, to order disgorgement and prejudgment interest, to impose civil penalties, and to order Defendants to remove certain information from their website and to send corrective notices to their clients. The Court will address each form of relief in turn.

    **a.  Permanent Injunction**

The Advisers Act authorizes federal courts to issue a permanent injunction against a defendant "upon a showing that such person has engaged, is engaged, or is about to engage in any . . . act or practice" that violates the Advisers Act. 15 U.S.C. § 80b-9(d). In determining whether to issue a permanent injunction, courts must consider "not merely the fact of a past violation" but also "the degree of scienter involved in the past violation, the isolated or recurrent nature of the infraction, the defendant's recognition of the wrongful nature of his conduct, and the sincerity of his assurances against future violations." *Sec. & Exch. Comm'n v. Gentile*, 939 F.3d 549, 562 (3d Cir. 2019). Courts must also consider "all the considerations of fairness that have been the traditional concern of equity courts," such as the "stigma, humiliation, and loss of livelihood" that could result to the defendants from an injunction and the "need to protect the public." *Gentile*, 939 F.3d at 562. Injunctions cannot be used to punish, so an injunction "must be denied as a matter of equitable discretion" if it "cannot be supported by a meaningful showing of actual risk of harm." *Id.* at 562.

Defendants violated both § 206(2) and § 206(4) of the Advisers Act. Neither of these provisions requires a showing of scienter, and the jury did not expressly find that Defendants violated § 206(2) with scienter. However, the Court finds that Defendants acted with scienter in violating these provisions.

It is undisputed that Defendants knew they were collecting 12b-1 fees, that their receipt of these 12b-1 fees constituted a conflict of interest, and that they had a duty to disclose their 12b-1 fee scheme to their clients. And, as a matter of law, Defendants had a duty to act in their clients' best interest and achieve best execution in their mutual fund transactions. The only question is whether Defendants knew their disclosures and internal policies were inadequate. And there is substantial evidence that, if Defendants did not know their disclosures and policies were inadequate, they were at least reckless with respect to their policies' and disclosures' adequacy.

Defendants certainly had notice that their 12b-1 scheme could violate their fiduciary duties under § 206(2) absent detailed disclosures. Defendants received at least three notices from their compliance consultant indicating that the SEC was enforcing § 206(2) against advisers whose investing practices were very similar to Defendants' practices. *See* Pl.'s Exs. 188, 195, 196. Although the settlement orders that resulted from these proceedings are not legally binding precedent, they should have at least put Defendants on notice that their business practices could run afoul of their fiduciary duties without carefully crafted policies and disclosures.

Despite these notices, however, Ambassador failed to adopt *any* written policy to safeguard Defendants' fiduciary duties in mutual fund transactions. To make matters worse, Defendants had received and reviewed a written policy that provided detailed procedures for achieving best execution in mutual fund transactions involving funds that charge 12b-1 fees. *See* Pl.'s Trial Ex. 42A § 7.3.1.3. Since Defendants had a model policy at their disposal, they, and Ambassador by imputation, were at least reckless in failing to adopt such a policy for Ambassador as required by SEC Rule 206(4)-7. Accordingly, Ambassador acted with scienter in violating § 206(4) of the Advisers Act.

Defendants conduct with respect to their disclosures also indicates that they violated § 206(2) of the Advisers Act with scienter. Despite receiving notice that their 12b-1 scheme could present regulatory issues, Defendants did not ask their compliance consultant to revise their disclosures. *See* 3/14/22 Trial Tr. 116:16–20. In fact, Defendants did not even inform their compliance consultant that they were receiving 12b-1 fees from clients that were also paying advisory fees. *See* 3/15/22 Trial Tr. 75:9-17. And then, at the outset of this litigation, Defendants attempted to prevent the SEC from discovering that Defendants had failed to inform their compliance consultant of their 12b-1 fee scheme. *See* Pl.'s Trial Ex. 142. There is also evidence that, when clients asked Defendants to clarify their fee structure, Defendants responded in a manner that suggested 12b-1 fees were unavoidable, failed to make clear Defendants were themselves receiving 12b-1 fees, and even misled clients to believe Defendants *were not* receiving 12b-1 fees. Pl.'s Exs. 81, 111.

Fundamentally, Defendants built their business model on receiving two streams of income—one stream from advisory fees and another stream from 12b-1 fees. These 12b-1 fees were entirely avoidable, but Defendants believed their services were worth both streams of revenue. It would not have been difficult for Defendants to simply inform their clients of these facts in a single, short, plain language statement. But Defendants did not at any point—even in their client agreement contract—provide their clients with such a straightforward statement. Instead, they scattered the information relevant to their 12b-1 fee scheme across numerous documents. Of course, there could be an innocent explanation for Defendants' failure to be clearer in their disclosures. But, in light of Defendants' ignoring alerts from their compliance consultant, failing to adequately inform or consult their compliance consultant, obstructing the SEC's discovery efforts, and responding to client questions about fees with less than transparent

answers, the Court cannot credit those innocent explanations. Instead, the Court finds that Defendants acted with scienter in failing to adequately disclose its 12b-1 fee scheme to its clients.[1]

Defendants' violation of § 206(2) was also recurrent. Defendants' entire business model was built upon investing their clients in 12b-1 fee bearing mutual fund share classes even when identical share classes without those fees were available. And Defendants did exactly that, repeatedly, for thousands of clients, over the course of almost four-and-a-half years. Throughout this period, Defendants failed to adequately disclose the nature of their business model and the conflict of interest inherent in it to their clients. Each investment Defendants made without adequately disclosing their 12b-1 scheme and the conflict of interest that attended it represents a recurrence of their violation of § 206(2).[2]

Defendants have also failed to acknowledge the wrongful nature of their conduct. Shortly after the jury returned its verdict in this case, Defendants released a video and statement declaring that their "clients were never overcharged, nor were gains or returns compromised in any way." *See* ECF No. 172-3, Ex. 1. Quite simply, Defendants' statement is inconsistent with the jury's verdict in this case. Further, Defendants' statement represents that the extent of their wrongdoing was that they "simply didn't have the SEC's preferred words included in [their]

---

[1] Defendants argue the Court cannot find that they acted with scienter because the jury did not expressly find that Defendants acted with scienter. But the SEC seeks remedies that are either equitable or committed to the court's discretion by statute. 15 U.S.C. § 80b-9(d)&(e). As a result, the Court has not only authority but also a duty to independently evaluate whether Defendants acted with scienter even though a jury has not expressly passed upon the issue. *See S.E.C. v. Mannion*, 28 F. Supp. 3d 1304, 1311 n.8 (N.D. Ga. 2014).

[2] Defendants argue that their violations were not recurrent because they were all part of a single scheme. But courts have taken a variety of approaches to determining whether a single scheme of conduct constitutes a single violation or multiple violations, and these approaches include treating each investor harmed and each transaction completed as a separate violation. *See S.E.C. v. GTF Enterprises, Inc.*, 2015 WL 728159, at *4 (S.D.N.Y. Feb. 19, 2015) (identifying a variety of ways to enumerate violations).

documents back in 2014-2018." But that is *not* the extent of their wrongdoing nor the reason the jury found them in violation of § 206(2).

Defendants violated their fiduciary duties under § 206(2) because they took money from their clients through conflicted transactions that were not in their clients' best interest without adequately disclosing to their clients either their revenue generation scheme or their conflict of interest. Rather than acknowledge that fact, Defendants have repeatedly attempted to deflect blame for their conduct onto the SEC as though it were the SEC's responsibility to ensure Defendants discharged their fiduciary duties and kept their clients adequately informed.[3]

The factors discussed to this point weigh in favor of a permanent injunction. Critically for Defendants, however, the remaining factors weigh strongly against a permanent injunction.

First, there are adequate assurances that Defendants will not repeat their violations of the § 206(2) and § 206(4) of the Advisers Act. Defendants no longer purchase 12b-1 fee bearing mutual funds for their clients and have transitioned to a new business model that does not rely on mutual fund investments. *See* ECF No. 175-1, Young Decl. ¶¶ 7–9. And Defendant Kauffman no longer actively works in the securities industry. *See* ECF No. 175-8, Kauffman Decl. ¶ 4. Further, there is no evidence that Defendants had ever violated § 206(2) or § 206(4), or any other securities law, before or after the period relevant to this lawsuit. The Court finds these changes in Defendants' practices and this generally positive regulatory history to be adequate assurances against future violations.

---

[3] Indeed, Defendants do not even acknowledge their wrongdoing in their remedies brief—instead, they acknowledge only their "liability." *See* ECF No. 175, Defs.' Final J. Brief at 25. Since trial, the closest Defendants have gotten to acknowledging their wrongdoing is their statement that, "[d]espite [Defendants'] well-reasoned case, a jury sided with the SEC and found Ambassador (and its owners) liable for violating Section 206(2) of the Investment Advisers Act." *See* ECF No. 172-3, Ex. 1. But acknowledging that a jury "sided with the SEC" falls well short of an acknowledgment that Defendants actually violated their fiduciary duties.

Second, the Court recognizes that granting a permanent injunction could have severe consequences for Defendants' reputations and livelihoods. If this Court were to issue an injunction, the SEC could initiate proceedings to bar Defendants from the investment advising industry. 15 U.S.C. § 80b-3(f). Defendants Young and Bostwick are still practicing investment advisers, and such a sanction would prevent them from continuing to earn a living in their chosen profession.

Balancing these factors, the Court finds that a permanent injunction would be inappropriate. To be sure, Defendants have conducted themselves in a manner that falls short of the standards the law imposes upon investment advisers. They violated their clients' trust repeatedly over a prolonged period of time, did so with scienter, and have failed to take responsibility for their conduct. But there is little chance the Defendants will return to the business practices that gave rise to this suit, and a permanent injunction would have severe professional consequences for Defendants. Considering Defendants' low likelihood of repeating their violations of § 206(2) and § 206(4), a permanent injunction would do little to protect the public and would instead venture into the territory of punishment. Accordingly, the Court will not issue a permanent injunction enjoining Defendants from repeating the conduct that gave rise to this suit. *See S.E.C. v. Jones*, 476 F. Supp. 2d 374, 385 (S.D.N.Y. 2007) (declining to issue an injunction where future harm to the public was unlikely but the collateral consequences of an injunction to the defendants would be severe).

### b. Disgorgement and Prejudgment Interest

Federal courts may order disgorgement to remedy violations of the Advisers Act. *See* 15 U.S.C. § 78u(d)(7) (authorizing federal courts to order disgorgement "[i]n any action or proceeding brought by the Commission under any provision of the securities laws"). To obtain a

disgorgement award, the SEC has the initial burden of producing evidence that supports "a reasonable approximation" of the "illegal profits" that are "causally related" to the defendant's wrongdoing. *S.E.C. v. Teo*, 746 F.3d 90, 103, 105 (3d Cir. 2014). Once the SEC has made this showing, the burden shifts to the defendant to demonstrate that the SEC's approximation is not reasonable or causally related to the defendant's wrongdoing. *Teo*, 746 F.3d at 105. But the SEC's approximation need not be perfect, and the risk of uncertainty in calculating the profits to be disgorged will typically fall upon "the wrongdoer whose illegal conduct created the uncertainty." *Id.*

The purpose of a disgorgement award is only to "deprive the wrongdoer of his ill-gotten gain," *Id.*, so a disgorgement award cannot exceed "a defendant's net profits from wrongdoing," *Liu v. Sec. & Exch. Comm'n*, 140 S. Ct. 1936, 1946 (2020). But a court may supplement a disgorgement award by ordering a defendant to pay prejudgment interest on his ill-gotten gains. *Teo*, 746 F.3d at 109. Determining whether to award prejudgment interest and identifying the appropriate interest rate and period are left to the court's discretion. *Id.* When courts award prejudgment interest, they often apply an interest rate that is consistent with the Internal Revenue Service's underpayment rate. *Id.* at 109–10.

The SEC has met its burden to produce a reasonable approximation of the illegal profits Defendants received as a result of their 12b-1 scheme. The SEC identified every dollar of 12b-1 fee revenue each Defendant received by investing their clients in a 12b-1 fee share class when a share class that did not charge 12b-1 fees but was otherwise identical was available. Pl.'s Trial Ex. 502. The SEC then reduced these revenues to account for the possibility that investing a client in a 12b-1 fee share class could be advantageous to the client when investing the client in a non-12b-1 fee share class would cause the client to incur transaction fees up to $30. *See* ECF No.

172-8, Higgins Decl. ¶¶ 4–7. The SEC then reduced the revenues further to account for the five-year statute of limitations for disgorgement awards issued for non-scienter-based claims. *See* ECF No. 172-8, Higgins Decl. ¶¶ 6–7. The Court finds the resulting figures to be reasonable approximations of the profits Defendants obtained in violation of their fiduciary duties during the relevant period.

Defendants, for their part, have not come forward with an alternative method for calculating their illegal profits. They criticize a few features of the SEC's calculation but offer no evidence to demonstrate how these criticisms would alter the value of disgorgement that is appropriate in this case. Defendants argue that the SEC's figures might include 12b-1 fees that are attributable to investments Defendants made before the relevant period but make no effort to identify which revenues should be excluded from the disgorgement award on this basis.[4] Defendants also argue that the SEC's summary fact witness that calculated the disgorgement award failed to "independently verify" the fund data he received from Defendants' broker. But Defendants have not identified any error in or reason to distrust this data, which was produced by Defendants' own broker.

Rather than come forward with evidence, Defendants have come forward with only unsubstantiated theoretical criticisms that, even if credited, cast little doubt on the reasonability of the SEC's approximation. Accordingly, Defendants have failed to carry their burden to rebut the SEC's reasonable approximation. *Cf. S.E.C. v. Teo*, 746 F.3d 90, 107 (3d Cir. 2014) (concluding that defendants had failed to meet their burden of rebutting the presumption of

---

[4] This argument is also incorrect on its merits. It is appropriate for the disgorgement award to include revenue Defendants received during the relevant period even if that revenue flows from an investment made before the relevant period because Defendants' violated their fiduciary duties not only by investing in 12b-1 fee share classes without their clients' informed consent but also by *keeping* their clients in 12b-1 fee share classes without their informed consent.

11

reasonable approximation because the defendants had come forward with an innocent theory of how they obtained their profits but had not adduced "specific evidence" to substantiate that theory).

Defendants also argue that the 12b-1 fees they received from Defendants are not causally related to their failure to adequately disclose their receipt of 12b-1 fees. Defendants argue, essentially, that they would have received these fees even if they had been more transparent about the fact that they were collecting them. They argue that, had their clients known they were paying Defendants an additional .25% on top of the disclosed advisory fee, the clients would have simply consented and paid the additional fee. The Court is entirely unpersuaded.

First, this argument is little more than a speculative *ex post facto* justification that Defendants make no attempt to prove. Defendants offer no evidence that their clients would have willingly paid an additional 20% in fees had they been made aware of the fees. In fact, this speculation runs counter to the evidence that *has* been introduced in this case. *See* Pl.'s Trial Ex. 111 (presenting a client's reluctance to pay advisory fees of "1.5–1.75%").

Defendants' speculation that their clients would have gladly paid more for their services is also entirely inconsistent with fundamental market principles. Had Defendants either properly disclosed the fact that they were increasing their clients' costs—and their own revenues—by investing in 12b-1 fee share classes or simply increased their own advisory fee by a commensurate amount, then their pricing would be less competitive in the market. Common sense dictates that at least some clients would have opted for a lower cost alternative. The testimony of investment advising expert Marti Murray corroborates this point. *See* 3/17/22 Trial Tr. 236:10–237:4 ("A reasonable adviser would go to [the] client and have the negotiation about [increasing] the fee . . . the client might agree to that, but their client might not agree to it, so that

12

is the risk."). Absent evidence that demand for Defendants' services is so inelastic that a 20% price increase would cause no attrition among Defendants' clients—evidence that Defendants make no attempt to adduce—this Court will not ignore fundamental market principles and presume that Defendants could have maintained the same revenues had they been fully transparent about their 12b-1 scheme and the price of their services.

Indeed, Defendants' argument highlights exactly why their failure to adequately disclose their 12b-1 scheme was so damaging to their clients. Because Defendants did not make their clients aware of the true cost of their services, they deprived their clients of an opportunity to make an informed decision about which adviser to invest with. Had the clients been fully informed, they could have shopped around for a more cost-effective adviser or negotiated down Defendants' fee. Having deprived their clients of that opportunity, Defendants now argue that they should be able to keep the fees their clients never consented to paying because we cannot know for certain how each client would have reacted to more honest disclosures. The Court cannot find any support in the law for such an unjust result.

As a last-ditch effort to avoid paying restitution to their clients, Defendants ask the Court to deduct what are essentially Defendants' overhead expenses from the disgorgement award. Specifically, Defendants ask the Court to deduct from the disgorgement award all the money Defendants spent on registration and licensing fees and on employee bonuses. Defendants apparently had a practice of paying these expenses with the 12b-1 fees they unlawfully collected from their clients. Defendants now seem to argue that, because they had allocated 12b-1 fees to pay for these expenses, they should be able to deduct these expenses from their 12b-1 fee disgorgement award. The Court cannot credit this argument.

It is quite clear that Defendants should not be able to deduct any business expenses from the disgorgement award because every dollar in the SEC's reasonable approximation represents an "ill-gotten gain." *Teo*, 746 F.3d at 105 (reasoning that "the goal" of disgorgement is "to deprive the wrongdoer of his ill-gotten gain"); *see also Liu*, 140 S. Ct. at 1942. This is not a case in which profits were generated by mixing unlawful activity with lawful activity, such as when a manufacturer infringes a patent in his production process but makes the infringing product ready for profitable sale only by incurring the business expenses that ordinarily accompany lawful business activity. *See Providence Rubber Co. v. Goodyear*, 76 U.S. 788, 803–04 (1869) (reasoning that a manufacturer who infringes a patent is ordinarily permitted to deduct the money he spent on "materials, interest, expenses of manufacture and sale . . . other necessary expenditures . . . and bad debts" from the revenues he generated in selling the infringing product).

Instead, this is a case in which the Defendants took money from their clients that they were not allowed to take without informed consent, which Defendants failed to obtain. Using this ill-gotten money to pay down business expenses—and to, therefore, leave greater profit for Defendants—is precisely what Defendants were prohibited from doing. To allow Defendants to achieve the same result through deductions to the disgorgement award would defeat the purpose of disgorgement. *See Providence Rubber Co. v. Goodyear*, 76 U.S. 788, 804 (1869) ("The controlling consideration is, that [the wrongdoer] shall not profit by his wrong. A more favorable rule would offer a premium to dishonesty, and invite to aggression.").

Accordingly, the Court finds that a disgorgement award equal to the SEC's reasonable approximation of Defendants' ill-gotten gains is appropriate. Further, because Defendants' 12b-1 scheme deprived their clients of the opportunity to invest the money they paid in 12b-1 fees and

because these fees essentially operated as an interest-free loan to Defendants, the Court also finds it appropriate to award prejudgment interest calculated at the Internal Revenue Service's underpayment rate. *See* 26 U.S.C. § 6621(a)(2).

### c. Civil Penalties

Congress has authorized courts to impose civil penalties upon individuals and entities that have violated the Advisers Act. 15 U.S.C. § 80b-9(e). Any time a natural person violates the Advisers Act, the court may impose a "first tier" penalty up to the greater of $9,484 or "the gross amount of pecuniary gain to such defendant as a result of the violation." 15 U.S.C. § 80b-9(e)(2)(A); 17 C.F.R. § 201.1001(b). Whenever a company violates the Advisers Act, the court may impose a "first tier" penalty up to the greater of $94,847 or "the gross amount of pecuniary gain to such defendant as a result of the violation." 15 U.S.C. § 80b-9(e)(2)(A); 17 C.F.R. § 201.1001(b). When a violation involves "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," the court may impose a "second tier" penalty, which increase the permissible penalties to $94,847 for an individual, $474,233 for a company, or "the gross amount of pecuniary gain to such defendant as a result of the violation." 15 U.S.C. § 80b-9(e)(2)(B); 17 C.F.R. § 201.1001(b).[5]

In determining the appropriate penalty, the Court considers a variety of factors including "(1) the egregiousness of the violations; (2) the defendant's scienter; (3) the repeated nature of the violations; (4) the defendant's failure to admit to his wrongdoing; (5) whether the defendant's misconduct created substantial losses or the risk of substantial losses to others; and 6) the defendant's lack of cooperation and honesty with authorities." *Sec. & Exch. Comm'n v. Zvodihikov*, No. CV 16-845, 2020 WL 634184, at *6 (D.N.J. Feb. 10, 2020). Civil penalties have

---

[5] *See also* https://www.sec.gov/enforce/civil-penalties-inflation-adjustments.

15

two purposes: to punish the violator and to deter future violations. *S.E.C. v. Moran*, 944 F. Supp. 286, 296 (S.D.N.Y. 1996).

At the outset, the Court finds that Defendants' violations are eligible for second tier penalties. As discussed above, Defendants' violation of SEC Rule 206(4)-7 was at least reckless. Further, Defendants' violations of § 206(2) involved deceit. As fiduciaries, Defendants had a duty to adequately disclose their conflicts of interest and to be transparent about their fees. But Defendants, acting with scienter, failed to make adequate disclosures to their clients. Defendants' failure to be transparent with their clients when they had a clear duty to be transparent constitutes deceit. Accordingly, Defendants are eligible for second tier penalties.

Defendants' violations of the Advisers Act were also egregious. Defendants obfuscated the fees they were taking from their clients and failed to inform their clients that they could have reduced their expenses by 20% without any consequence to the quality of their investments. A client should be able to trust that that an investment adviser will put the client's interests first and that the adviser will be forthcoming with all the information the client needs to make informed decisions about her investments. These expectations go straight to the core of the investment advising relationship. By failing to meet these expectations, Defendants not only violated their clients' trust but also undermined confidence in the investment advising industry.

Defendants' violations are all the more concerning because, as discussed above, Defendants committed them with scienter repeatedly over four-and-a-half years and still refuse to admit their wrongdoing.

And even though any individual client might only have lost a small proportion of their investment to Defendants' scheme, that fact does little to reduce the significance of Defendants' violation because their violation was persistent and pervasive. Indeed, Defendants likely were

able to continuously overcharge their clients specifically because 12b-1 fees represented only a relatively small portion of any single client's overall investment.

Further, Defendants did not assist the authorities in investigating or remedying their violations. The SEC created a voluntary reporting program that gave advisers like Defendants an opportunity to self-report their failure to adequately disclose their receipt of 12b-1 fees.[6] But Defendants did not participate in that program and instead chose to litigate this case. Then, during litigation, Defendants attempted to prevent the SEC from discovering information relevant to their violations. In light of this conduct, the Court cannot conclude that Defendants assisted the SEC to enforce the Advisers Act in this matter.

Balancing these factors, the Court finds it appropriate to order each Individual Defendant to pay a civil penalty equal to the unlawful gain he received from the 12b-1 scheme. Further, the Court finds it appropriate to order Ambassador Advisers, as an entity, to pay a second tier penalty equal to the total unlawful gain Defendants made collectively from their 12b-1 scheme.[7] Defendants did not violate the Advisers Act merely as individuals—they built their entire business model on violating the Advisers Act. Since all the firm's operations were premised on using unlawfully obtained revenue to defray operating costs—and to thereby increase profits— the Court finds it appropriate that the firm itself should be made to pay a penalty. Ordering civil penalties against the firm itself will deter the directors and managers of other investment advisory firms from pursuing business models that rely on violating clients' trust. Ambassador's business has also continued to grow during the pendency of this litigation. *See* ECF No. 172-4

---

[6] *See* U.S. Securities and Exchange Commission, *Share Class Selection Disclosure Initiative*, https://www.sec.gov/enforce/announcement/scsd-initiative.

[7] The Court finds it appropriate to impose only a single civil penalty against Ambassador to cover both its violations of § 206(2) and § 206(4) because the Court finds that both these violations were interrelated components of Ambassador's 12b-1 scheme.

at 4. In light of Ambassador's current assets under management, a smaller penalty is less likely to achieve an appropriate deterrent or punitive effect against Defendants.

### d. Orders to Correct Website and Send Notices to Clients

Defendants website continues to display two statements that are plainly inconsistent with the Court's findings and the stipulated facts in this case. First, the website continues to state that "Ambassador had a reasonable and good faith belief that its disclosures followed the SEC's instructions." This statement is inconsistent with the Court's finding that Defendants acted with scienter in failing to adequately inform their clients about their 12b-1 fee scheme. Second, the website continues to display the following statement: "despite this case's outcome, know that clients were never overcharged nor were their gains or returns compromised." This statement is inconsistent with the established fact that Defendants invested their clients in 12b-1 fee bearing share classes when otherwise identical share classes that did not charge these fees were available. *See* ECF No. 136 ¶ 4. By making their clients pay fees the clients had not agreed to pay, Defendants necessarily overcharged their clients. And by making their clients incur avoidable fees, Defendants necessarily reduced their clients' return.

Accordingly, the Court finds it appropriate and in the public interest to order Defendants to remove these misleading statements from their website. Further, to correct the confusion Defendants have created through their misrepresentations of these proceedings, the Court finds it appropriate to further order Defendants to deliver a clarifying notice to their clients. As specified in the Order that will follow this opinion, the parties will have an opportunity to submit proposals for this notice to the Court, and the Court will make a final determination as to the form and content of the notice.[8]

---

[8] The SEC also argues that Defendants have failed to properly amend their regulatory filings to reflect developments in this case. Defendants seem to take the position that the

## IV. CONCLUSION

The Court will not issue a permanent injunction against Defendants. The Court will, however, order Defendants to pay restitution and civil penalties as follows:

| *Defendant* | *Disgorgement* | *Prejudgment Interest* | *Civil Penalties* | **Total** |
|---|---|---|---|---|
| Bostwick | $136,620 | $35,273 | $136,620 | **$308,513** |
| Kauffman | $349,395 | $95,972 | $349,395 | **$794,762** |
| Young | $136,627 | $35,275 | $136,627 | **$309,529** |
| Ambassador | N/A | N/A | $622,642 | **$622,642** |
| **Total** | **$622,642** | **$166,520** | **$1,245,284** | **$2,034,446** |

The Court will also order Defendants to remove the misleading statements discussed in this opinion from their website and to send a corrective notice to their clients.

BY THE COURT:

*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Court Judge

---

amendment the SEC seeks is not necessary until the Court enters final judgment in this matter. The Court expresses no opinion as to the correctness of Defendants' position. But the Court presumes that Defendants will properly report the outcome of this proceeding once this opinion is issued and the accompanying final judgments are entered.